# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

**FILED**

SEP 30 1997

U.S. DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DEBRA R. BYRD, et al.,** | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-95-N-3087-S |
| | ] | |
| **FIRST REAL ESTATE** | ] | |
| **CORPORATION OF ALABAMA,** | ] | |
| **et al.,** | ] | |
| | ] | |
| Defendant(s). | ] | |

**ENTERED**

SEP 30 1997

### Memorandum of Opinion

## I.    Introduction.

In this housing and employment discrimination action, Debra Byrd ("Byrd") and

Patricia Humes ("Humes") make claims under: 1) the Fair Housing Act of 1968 ("FHA");

42 U.S.C. §§ 3601, *et seq.,* as amended; 2) Sections 1981 and 1982 of the Civil Rights Act

of 1866 ("Section 1981" and "Section 1982"); 42 U.S.C. §§ 1981, 1982; and 3) Alabama state

law. *Complaint* at 9-12.  The plaintiffs, African-American real estate agents who worked for

defendants, allege discrimination in housing and employment on the basis of race against

First Real Estate Corporation of Alabama ("FREC"), against FREC president, Fred Ulbricht

("Ulbricht"), and against FREC broker-managers, Linda Shelton ("Shelton") and James

Latham ("Latham").  *Id.* at 1-3.  The plaintiffs also assert a claim of outrage, intentional

infliction of emotional distress,  under Alabama state law against all defendants. *Id.* at 12.

47

The court presently has for consideration defendants' motion for summary judgment with respect to all claims, filed on November 25, 1996. The motion has been fully briefed, and upon due consideration, will be granted in part and denied in part.

## II.    Statement of Facts.[1]

FREC is a residential and commercial real estate company based in Birmingham, Alabama. It operates seventeen brokerage offices, including the Western Office, located in Hueytown, Alabama, and the Hoover Office located in Hoover, Alabama. Defendants Shelton and Latham are broker-managers of the Western and Hoover offices respectively. The broker-managers work under an employment contract with FREC[2] and are compensated based upon the sales performances of their respective offices. Defendant Ulbricht is president of FREC.

In the summer of 1991, Shelton contacted Humes, who was then working at another real estate agency, CKM. *Deposition of Humes* at 29-31. Humes had previously interviewed with Shelton before taking the position at CKM. *Id.* Shelton asked Humes to

---

[1]The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

[2]The "Broker-Manager Employment Contract" states, in part:

Manager acknowledges that he has been informed that the Broker [FREC] subscribes fully to the Fair Housing Law (Title VIII of the Civil Rights Act of 1968) and agrees that he will comply fully with the Hud Poster, 1972-745-091/484, which poster is prominently displayed on the office bulletin board. *Movants' Evidence Submitted in Response to Exhibit D of the Court's Order* at Exhibit 2.

Shelton's contract also provides that she "assumes responsibility for the Western Office of First Real Estate." *Id.*

come work at FREC, and about a month later, Humes transferred her real estate license to FREC's Western Office. After working at FREC for about a month, Humes told Shelton that Byrd should also be recruited as an agent. After a meeting with Humes and Shelton, Byrd also came to work at FREC's Western Office. Byrd chose FREC based upon Humes's recommendation that the company was large and had much to offer and based upon Shelton's explanation of the advantages available at FREC. Humes and Byrd worked as sales associates at FREC, governed by a written agreement with FREC.[3]

### A.    **Byrd's Tenure at FREC's Western Office.**

The service area of FREC's Western Office is the western part of Birmingham, and the western suburbs, including the communities of Pleasant Grove and Hueytown. The racial demographics of Pleasant Grove and Hueytown have not substantially changed since the 1960's. Residential neighborhoods exist in Pleasant Grove and Hueytown that are almost exclusively white. White agents at FREC rarely show homes to black prospective buyers in these two towns;[4] when they do, they frequently encounter resistence by white

---

[3] The "Broker-Sales Associate Independent Contractor Contract" states, in part:

Sales Associate acknowledges that he has been informed that the Broker [FREC] subscribes fully to the Fair Housing Law (Title VIII of the Civil Rights Act of 1968) and agrees that he will comply fully with the Hud Poster, HUD-928.1 (8/93), which poster is prominently displayed on the office bulletin board. *Movants' Evidence Submitted in Response to Exhibit D of the Court's Order* at Exhibit 1.

The Broker-Sales Associate contract also provides that agents will have available all current listings of the office, will be assisted by advice and instruction, will receive "full cooperation in every way possible," and will share in use of all facilities of the office." *Id.*

[4] Don Cornutt, Glen Wadsworth, Dan Dulaney, Johnny Pate, Renee long, and Joe Fondaw are white agents who worked in the Western Office at all relevant time periods. According to Dulaney, Wadsworth and Cornutt, black persons are not as likely to view homes in Pleasant Grove and Hueytown. Several years ago, Fondaw heard a discussion in the Western office about a black family's purchase of a home in a predominantly white neighborhood, a fact that Fondaw described as "unusual."

Wadsworth has never shown a home owned by a black person to a white prospect; according to

3

residents.[5]  Shelton knew of incidents where sellers have instructed agents not to sell to

black persons. *Deposition of Shelton* at 203, 206-07; *Deposition of Renee Long* at 58-59,

61, 94.  Despite this history of racial animus, when Byrd began work as a FREC sales

associate, she stated that she wanted to make a change because FREC had no black

brokers[6] and that she wanted to advance to the level of broker.

Byrd makes several general complaints about working conditions at the Western

Office.  First, she complains about access to homes in Pleasant Grove and Hueytown that

---

Wadsworth, this does not occur often. Also, Wadsworth has never listed a home owned by a black person in Pleasant Grove, and he listed only one home owned by a black person in Hueytown.

    Pate has sold homes in white neighborhoods to black persons on four or five occasions, but never in Hueytown or Pleasant Grove. Fondaw has likely never shown black persons homes in white neighborhoods in Pleasant Grove or Hueytown. Dulaney has likely never sold a house in a predominately white neighborhood in Pleasant Grove or Hueytown to a black person.

[5]White agent Long believes Pleasant Grove is noted for "discrimination," and she avoids Pleasant Grove based upon racial incidents that occurred there. Every time she has shown a black person a home in Pleasant Grove, she has encountered difficulty such as neighbors standing in their yards "staring like daggers coming out of their eyes."

    Once when Long attempted to show homes in Pleasant Grove to black persons, neighbors made several phone calls to Long threatening her life, using the word "nigger," and telling her, if black persons moved in, that would be the last house she would sell. Once when Long showed a home to black persons, neighbors stood in the yard and yelled, "Go home nigger." On two occasions, Long had a seller refuse to initial a non-discrimination provision in the listing agreement. Long reported these incidents to Shelton.

    Also, Long witnessed neighbors in her own Hueytown subdivision yelling "nigger' when she showed a home in the subdivision to black persons. Long showed a home to a white couple who refused to purchase the property because a black person lived next door.

    White agent Dulaney had neighbors of sellers in Pleasant Grove and Hueytown ask him, "Your (sic) not going to show this house to a black, are you," when he placed a sign or showed a house. On more than five occasions, white agent Cornutt has had white sellers in Pleasant Grove and Hueytown state that they did not want their homes shown to black persons. White agent Fondaw has had sellers state their preference for the race of the buyer when he was discussing the listing agreement with the seller, and he has had white sellers ask him if prospective buyers are white or black.

    White agents Dulaney and Wadsworth have had prospective buyers ask about the racial composition of neighborhoods. White agent Pate has had white sellers tell him that their homes have been shown to black persons. A member of his church told Pate that a black agent showed one of Pate's white-owned listings to a black person. Two weeks after Pate listed and sold a home to black persons in a white neighborhood, neighbors wrote in the driveway, "Get out of Sylvan Springs."

    Finally, the receptionist at FREC has heard agents discuss the race of persons viewing listings.

[6]Shelton testified that FREC had no black broker-managers, but at least one black associate broker. *Deposition of Shelton* at 247. Latham testified that FREC had black assistant broker-managers. *Deposition of Latham* at 91-92.

4

were listed for sale by white agents representing white owners. In general, for an agent to show a home, the selling agent must contact the listing agent to schedule the appointment. The listing agent then provides the key to the home.

Byrd insists that often, when she contacted white agents Dan Dulaney, Joe Fondaw, Johnny Pate, Danny Little and Rhonda Boaz to schedule appointments to show their listings in Pleasant Grove and Hueytown, the agents would make excuses to prevent her showing these homes.[7] Byrd contends that when she tried to reschedule the showing of a home, she was given a different reason the home could not be shown. She contends that as a result of her inability to schedule appointments, she would lose potential home buying prospects. *Deposition of Byrd* at 99.

Byrd complained to Shelton on several occasions that agents were frustrating her attempts to show homes.[8] Even though FREC's policy was that brokers should report to president Ulbricht all suspected Fair Housing Act violations, Shelton did not report any of the incidents that concerned Byrd. Agents from other companies also refused to allow

---

[7] Specifically, Byrd contends the agents would say that they had offers coming in, the house was under contract, or the homeowner "doesn't want it shown today." *Deposition of Byrd* at 101-03, 107. *Declaration of Debra Byrd* at §§ 2-16 (reciting twelve specific incidents). However, an offer, or even a contract, on a home does not preclude a house from being shown.

No agent ever exactly told Byrd that she could not show a home in a white area to a black buyer. Furthermore, agents in the Western Office would sometimes prevent other white agents from showing their listings so that they could sell the property in order to obtain both selling and listing agents' commissions.

[8] Byrd identified the agents as Dan Dulaney, Johnny Pate, Joe Fondaw, Danny Little and Rhonda Boaz. *Deposition of Byrd* at 107-08. Shelton acknowledges that she was informed by Byrd about her "having a problem with some agents not being able to set up appointments or homeowners not letting her show houses and that she wasn't able to go into certain neighborhoods to show." *Deposition of Shelton* at 185-86. Shelton admits that Byrd told her about specific properties she was having difficulty showing. *Id.* at 188. However, Shelton cannot identify any agents to whom she spoke regarding their refusal to show homes. *Id.* at 188-89, 193. Also, Shelton did not document any of Byrd's complaints or any response to them. *Id.* at 450; *Deposition of Byrd* at 193.

Byrd to show homes in Pleasant Grove and Hueytown.  Byrd complained to Shelton about

this too, but Shelton never contacted any other companies in this regard.

Black agents rarely sold homes in Pleasant Grove or Hueytown; in fact, black agents

rarely even brought black clients into Pleasant Grove or Hueytown.[9]  *Deposition of Don*

*Cornutt* at 47-48;  *Deposition of Dan Dulaney* at 111;  *Deposition of Renee Long* at 118;

*Deposition of Byrd* at 204.  Byrd, however,  told agents at FREC that "she could sell to

anybody anywhere."  *Deposition of Shelton* at 400.  White FREC agents complained to

Shelton that Byrd caused confusion by showing homes in Pleasant Grove and Hueytown

to black prospects.[10]  Shelton told Byrd, "This is a redneck community."  Shelton believed

that the area was not ready or could not accept racial change.[11]

Byrd and Humes both allege that Shelton had a meeting with them and that Shelton

told Byrd that she should not show homes in Pleasant Grove or Hueytown to black buyers.[12]

*Deposition of Byrd* at 230-31; *Deposition of Humes* at 114-16, 119.  Shelton specifically

denies saying any such thing.  *Deposition of Shelton* at 202, 215, 227.  Byrd further alleges

---

[9] White agent Glen Wadswoth never listed a white-owned home in Hueytown or Pleasant Grove that was purchased by a black person through a black agent.  *Deposition of Wadsworth* at 105.  White agent Johnny Pate has never shared a commission with a black agent at FREC involving a home in Pleasant Grove or Hueytown.  *Deposition of Pate* at 97-98.  Shelton believes that a majority of black agents in the Western Office sold in "areas where black people really wanted to be."  *Deposition of Shelton* at 222.

[10] For example, white agent Glenn Wadsworth asked Shelton why Byrd constantly showed his listings in Hueytown.  He told Shelton that his sellers had asked why Byrd was always showing a black couple.

[11] Byrd testified that, on more than one occasion, Shelton told her "if blacks would stay on their side of town and whites on their side, there would be less of a problem."  *Deposition of Byrd* at 201-02, 205.  Shelton, however, specifically denies that she ever told Byrd that "it is not a good idea to mix the communities."  *Deposition of Shelton* at 202, 215.

[12] White agent Renee Long remembers Byrd being upset that "Linda told her she shouldn't show houses in Pleasant Grove or Hueytown."  *Deposition of Renee Long* at 26.  According to Long, Byrd asked her, "Can your agent do that?"  *Id.*  Long said, "No, that's law.  She cannot tell you where to sell houses."  *Id.* at 26-27.

6

that Shelton told her that if she showed homes in this region to black buyers, she should inform the agent that her buyer was black.[13] *Deposition of Byrd* at 232. Byrd continued to show homes to blacks in those areas. *Id.* at 234-35.

On two occasions, Byrd told Shelton that if she continued to "talk down to her" regarding incidents that were occurring, she would go to the FBI. On one occasion, Shelton questioned Humes about whether Byrd was a "tester" for housing discrimination. On another occasion, Shelton called Byrd and Humes into her office and questioned Byrd about being a "tester" and/or working for the FBI. Shelton told Byrd that agents in the office believed that she was a "tester" because she wanted to show houses in Pleasant Grove and Hueytown a majority of the time. After the statements about Byrd being a "tester," agents shunned Byrd in the office. Shelton told Byrd that "she had brought a lot of it on herself" by threatening to report FREC to the FBI.

Byrd also complains that walk-in and phone referrals were distributed in a racially discriminatory manner. "Opportunity Time" ("OT") is the system by which FREC distributes referrals. When calls come into the office, the receptionist puts them through to the OT agent on duty. OT is a good source of business, and Byrd participated in OT as

---

[13] Byrd also testified that Shelton told her, in Humes presence, that blacks were still not allowed to do certain things. *Deposition of Byrd* at 210-11. Although defendants dispute this, plaintiffs have proffered sufficient evidence to at least create a genuine dispute. *Id; Movants' Reply to Opponents' Additional Statement of Facts* at ¶ 123.

The only thing the defendants expressly admit that Shelton said at that meeting was that "there are areas in Birmingham where there are a lot of rednecks and that sometimes showing blacks houses in those neighborhoods could cause problems." But, defendants do not provide evidentiary support for this statement. *See Movants' Initial Submission in Response to Exhibit D of the Court's Order* at 11 (citing *Deposition of Shelton* at 201-02).

The parties agree that Byrd went to president Ulbricht and told him about the comment made by Shelton. *Deposition of Byrd* 233.

often as she could, whenever other agents did not want to participate. In fact, Byrd likely participated in OT more than any other agent. The majority of Byrd's sales were the result of OT,[14] and most of the calls that Byrd received during OT were from black prospects.[15]

Vicki Lucas was the receptionist at FREC from 1991 until 1995. When callers asked to speak to a "white agent" at the Western Office, Lucas would refer the caller to a white OT agent. If the OT agent was black when Lucas received a request for a "white agent," she would move down the OT list to the next white agent scheduled for OT and refer the call to that agent. Lucas never discouraged a racial request by callers; according to Lucas "the customer is always right." *Deposition of Vicki Lucas* at 139. No one ever told Lucas to cease the telephone referral policy based upon race.[16]

Byrd complained to Shelton that she was receiving calls only from black prospects.[17] Shelton told Byrd that she would speak to the secretaries about OT practices, but she never returned to Byrd with any response. Byrd maintains that Shelton never investigated her

---

[14]Most of Byrd's OT business was in the form of sales; Byrd received only one or two listings from OT.

[15]Byrd contends that, while working OT, she only received two or three calls from white prospects. *Deposition of Byrd* at 122. When white agents Glenn Wadsworth, Dan Dulaney, Johnny Pate and Joe Fondaw served on OT duty, they received calls form both white and black callers. Dulaney testified, "Well, you get blacks and whites every day. Every time you do OT, you are going to get a white or a black or both or several of each call in." *Deposition of Dan Dulaney* at 93.

[16]Byrd contends that Western Office agent Renee Long told her that Lucas had related to her that Shelton instructed Lucas to refer white walk-in clients to Dan Dulaney and Rhonda Boaz, rather than to a black OT agent. *Deposition of Byrd* at 122-25. Long does not recall a conversation with Lucas about white prospects being directed to white agents. *Deposition of Renee Long* at 38.

[17]Shelton, Lucas, and white agents, Don Cornutt, Joe Fondaw and Glenn Wadsworth all admit that it is often possible to determine a caller's race over the telephone.

complaint about racially based referrals during OT.[18] *Deposition of Shelton* at 374-75.  After Byrd complained to Shelton, she continued to receive OT calls on the same basis as before.

Byrd also complains that office space in the Western Office was assigned in a racially discriminatory manner, but defendants maintain that office space was assigned based upon seniority and production.  Shelton assigned the office space to agents in the Western Office.  Million dollar producers had private offices.  When Byrd first started at FREC, she was assigned to an office with six other agents.[19] *Deposition of Byrd* at 80.  She contends that, until she moved out of the back area into an office with three white agents, the black agents were all situated in the back of the Western Office.  The defendants do not dispute that white agents were not located on the back end of the office.

Byrd also complains that Shelton directed her husband to wait for her outside the office.  Shelton told Byrd that the whole office complained about Byrd's husband coming into the office to wait for her.  Shelton told Byrd's husband that the other agents felt "uncomfortable" with him in the office.  Other agents had spouses and children come into the office, play in the hallway and watch television.

---

[18] Defendants dispute Byrd's contention that Shelton never investigated her complaint about discriminatory distribution of referrals through OT. *Movants' Reply to Opponents' Additional Statement of Facts* at ¶ 171, n.1. However, when she spoke to receptionist Lucas about whether or not Byrd was getting her OT calls, Shelton testified that she did not ask Lucas why certain calls were not going to Byrd. *Deposition of Shelton* at 374-75. Therefore, plaintiffs have proffered sufficient evidence to at least create a genuine dispute in this regard.

[19] Defendants assert that, when an agent is first hired, he or she is assigned to the "bull pen," a large area with many desks. *Movants' Initial Submission in Response to Exhibit D of the Court's Order* at 5 (citing *Deposition of Shelton* at 313, but not submitted to the court). However, defendants offer no evidence in support of this contention. *Movant's Evidence Submitted in Response to Exhibit D of the Court's Order* at Exhibit 4.

Byrd complains about Shelton's use of the term "fish-eyed fool."[20] Shelton made a practice of referring to Catherine Brown, a FREC sales associate, as a "fish-eyed fool," both in and out of her presence. Brown was not offended by Shelton's reference to her, and Brown referred to Shelton as a heathen. Byrd, however, was offended by Shelton's practice of referring to Brown in this way.[21] Furthermore, Shelton once called Byrd a "fish-eyed fool," and Byrd told Shelton never to call her that name again.[22]

Byrd also complains that, while she was at the Western Office, she was never allowed to appear on the FREC "First Home Show," an advertisement on television. Initially, FREC's policy was to allow two agents to be featured on each show. Although she expressed an interest in appearing, Byrd did not appear on the show while at the Western Office; but when Byrd transferred to the Hoover Office, she did appear on the show. Later, the policy was changed to use the same agent on the show each month. The Western Office did not feature a black agent on the show until 1996.

Byrd also complains of specific incidents that occurred while she worked at the Western Office. First, Byrd showed several of white agent Glen Wadsworth's listings in Hueytown and Pleasant Grove to black prospects. Several white neighbors complained to the owner of one of the homes in Hueytown that Byrd showed the home to three black prospective purchasers. The seller told Wadsworth that the neighbors were unhappy, and

---

[20]"Fish-eyed fool" refers to the fictional character, Aunt Esther, on the television situation comedy, "Sanford and Son."

[21]Black agent Mary Collins told Byrd that she was also offended by the comment.

[22]Byrd also once heard an agent in the Western Office comment about a "dumb black person." *Deposition of Byrd* at 315-16. She never reported the incident. *Id.* at 316.

asked why Byrd showed the house to three black prospects. Wadsworth believed it unusual in Hueytown for three black prospects to view one home,[23] and, although he never approached the neighbors or questioned the owner about the problem, Wadsworth did notify Shelton. When the listing expired, the owner did not renew it with Wadsworth, but instead listed with another company. Wadsworth has had few listings taken from him.

On another occasion, Byrd was the selling agent on a contract in which white agent Ralph Ozley was the listing agent. Financing that contract took longer than usual because Byrd's client was a veteran. Even though it is not common practice, Ozley called Byrd's client's mortgage company and called Byrd's client directly. Uncomfortable with this, Byrd's client asked her to ensure that it would not happen again. However, when Byrd asked Ozley to refrain from calling her client directly, Ozley raised his voice and insisted that he would call her client anytime he wished.

In May 1992, Byrd was the agent for the Parkers, a black couple who purchased a home in a predominantly white area of Pleasant Grove. Don Cornutt, a white FREC agent, was the listing agent for the white sellers, the Cappses. After the sales contract was signed, but before closing, Mrs. Capps told Cornutt that her next-door neighbor had threatened to bomb the house if blacks moved in.[24] Cornutt told Shelton, but neither of

---

[23]Wadsworth believes that, prior to Byrd showing his listing, a black agent had never shown a home in Hueytown to three black prospects.

[24]Shelton and Byrd both testify that Cornutt told them about the bomb threat, that all three had a meeting about the bomb threat in Shelton's office, and they included Jim Holliman, FREC attorney, in the discussion by speaker phone. *Deposition of Byrd* at 157-160; *Deposition of Shelton* at 523-26, 532, 537.
Defendants dispute this because Cornutt testified as follows:

Q:      Did Mrs. Capps say anything about a neighbor making a bomb threat?
A:      Not that I recall.

them documented the threat or investigated the identity of the neighbor. Byrd learned of the threat a week later.[25] Thereafter, Shelton, Cornutt and Byrd met in Shelton's office and contacted FREC attorney, Jim Holliman, by speaker phone, to discuss the matter.[26] Although Byrd wanted to immediately call the FBI and contact the Parkers, Holliman informed them that they had no legal right to inform the Parkers.[27] However, Byrd informed the Parkers anyway. The Parkers bought the home despite the threat and have had no trouble. Ms. Byrd does not believe the incident would have been handled the same way if she were white.

Also in 1992, Shelton acted as listing agent on a residential property owned by her cousins, the Matsons. Byrd showed the home to a black couple, the Boyds. The Boyds made an offer on the house which required the seller to pay closing costs on the buyers' mortgage. This offer was rejected by the seller. Byrd contends that Shelton told her that the offer was rejected because the buyers were black,[28] that Shelton wrote "reject" across

---

Q:    That's something you would recall?
A:    You would think it would be something that I would recall. . . . All I remember is he was upset with them because of the black situation. *Deposition of Don Cornutt* at 117.

[25]The parties agree that a week elapsed, and Byrd claims that she only found out because Cornutt asked her, in Shelton's presence, whether Shelton had informed her of the bomb threat. *Deposition of Byrd* at 158. However, Shelton testified that, after Cornutt told her, "the next step [she] took was to tell Debra about it." *Deposition of Shelton* at 532.

[26]Prior to informing Byrd, Shelton discussed the bomb threat with FREC president, Ulbricht. Ulbricht testified that it was FREC policy to inform "everybody who was affected" about a threat as serious as this. *Deposition of Ulbricht* at 30-31.

[27]Byrd contends, and defendants dispute, that Shelton instructed Byrd not to inform the Parkers of the bomb threat. *Deposition of Byrd* at 161-62; *Deposition of Shelton* at 537-38. Byrd also contends that president Ulbricht did not want to inform the Parkers because he was concerned about being sued by the Capps if the Parkers did not buy the home. *Deposition of Byrd* at 162.

[28]This fact is undisputed. *Movants' Initial Submission in Response to Exhibit D of the Court's Order* at 11; *Opponents' Statement of Facts in Response to Exhibit D of the Court's Order* at 6.

12

the Boyd's contract without giving them the opportunity to make a counter-offer,[29] and that Byrd told Shelton that this was a violation of the Fair Housing Act.[30]  Subsequently, the seller accepted a full price offer from white buyers represented by Johnny Pate, a white FREC agent, but that offer required the buyers to pay their own closing costs.[31]

In June 1992, Byrd, according to her, transferred from FREC because of the handling of the racial threat against the Parkers and the other problems she encountered from white agents regarding the showing of properties in Pleasant Grove and Hueytown.[32]  *Deposition of Byrd* at 171.  For a two week period, Byrd worked as an agent for White & Associates, a small black-owned company with fifteen agents.  Shelton tried to convince Byrd not to leave and tried to convince her to come back.  Shelton increased Byrd's commission percentage as an incentive to bring her back to FREC.

Byrd returned to FREC, in part, because FREC was the largest company in Birmingham and it had more to offer than any small company.  When she returned to FREC, Byrd testified that the problems with white agents became worse because Shelton did not attempt to resolve the problems.  *Deposition of Byrd* at 135-36.

---

[29] *Deposition of Byrd* at 192.

[30] Although defendants dispute this, plaintiffs have proffered sufficient evidence to at least create a genuine dispute. *Movants' Reply to Opponents' Additional Statement of Facts* at ¶ 145; *Deposition of Byrd* at 186.

[31] The Boyds eventually bought a home owned by Shelton's son's future wife.  This home was listed with Sandra Jasper, a FREC agent in the Western Office.  Shelton drove to Montgomery with Byrd and Mr. Boyd in an effort to get the Boyd's application for a VA loan approved.

[32] Although defendants dispute this, plaintiffs have proffered sufficient evidence to at least create a genuine dispute. *Deposition of Byrd* at 171; *Movants' Reply to Opponents' Additional Statement of Facts* at ¶ 139.

In April of 1993, white agent Flo Pulliam listed a home in a predominantly black neighborhood, which one of Byrd's clients wanted to purchase. After Byrd submitted the contract to Pulliam, Pulliam did not return the executed contract to Byrd. One week later, Byrd complained to Shelton about Pulliam's failure to return the executed contract. Although she did not do so, Byrd wanted to file a grievance against Pulliam for failing to promptly execute and return the contract because the delay could have jeopardized the client's offer.

In May 1993, Byrd spoke to FREC president Fred Ulbricht about Shelton's alleged instructions not to show homes to black persons in Pleasant Grove and to instruct the agents if the proposed buyers of such homes were black.[33] She also informed him of the bomb threat on the Parker home, the situation with Shelton's cousin's home, and the problem retrieving the contract from Flo Pulliam. She told him that she felt uncomfortable with agents in the Western Office, and that she was not receiving referrals at the Western Office. Ulbricht's only response to Byrd about her complaints was to ask her, on one of his visits to the Western Office, if "things in the office were any better." *Deposition of Ulbricht* at 21.

Byrd also complains about not having access to office computer software. "Top Producer" is software that Shelton had long wanted to acquire: it was frequently touted in real estate literature because it allowed agents to document much useful information.

---

[33] Ulbricht acknowledges receiving complaints from Byrd about not being treated fairly in the Western Office, about Shelton's instructions regarding not showing homes to non-whites, and about agents not helping her with her work. *Deposition of Ulbricht* at 13-15. However, Ulbricht made no record of any investigation that he may have conducted because, according to Ulbricht, after discussing the matter with Shelton, "It was apparent to me that . . . it wasn't a valid complaint." *Id.* at 17-21.

14

When the FREC Western Office acquired the program, secretaries of those agents having more than $500,000 in sales were allowed to use it. Because she qualified, Shelton provided Byrd with a code to use the Top Producer program on the Western Office computer.[34]

In November 1993, Byrd instructed her secretary, Diane Thomas, to use the Top Producer computer program.[35] But, every time Thomas undertook to use the program, she was informed by another secretary that she could not use it. Humes observed that other secretaries, who were white, always used the computer in the prime time of the day, and Thomas, who was black, had to wait to use the computer. *Deposition of Humes* at 139, 143-44. Byrd complained to Shelton and Ulbricht about not having access to the program. Shelton gave Byrd no assurance that the situation would be resolved.

Also in November 1993, Shelton told Byrd that she was not doing certain things around the office. Byrd told Shelton that she could no longer take the situation in the Western Office. *Deposition of Byrd* at 248. Shelton responded, "I know the real reason why you're leaving is because of the racism in the office; there's nothing I can do about it."[36] *Id.* In December 1993, Byrd transferred her real estate license to FREC's Hoover Office.

---

[34] By November 1993, Byrd had made the "$500,000 Club."

[35] FREC pays for secretaries for its top producers. In November 1993, Byrd paid for her own secretary.

[36] Although defendants dispute this, plaintiffs have proffered sufficient evidence to at least create a genuine dispute. *Movants's Reply to Opponents' Additional Statement of Facts* at ¶ 239.

### B.   Byrd's Transfer to FREC's Hoover Office.

In November 1993, Byrd met with Jim Latham, the broker-manager at the Hoover Office, regarding a transfer from the Western Office.   According to Byrd, when she met with Latham, she told him about her problems at the Western Office, including the Parker incident, the Boyd incident, Shelton's instructions about selling to black persons, Shelton's statements about black persons staying in black areas, and Shelton's reference to a "fish-eyed fool." *Deposition of Byrd* at 245-47, 343-44.  Latham has no recollection of her telling him about any problems she had at the Western Office. *Deposition of Latham* at 108-09.  Byrd also says Latham reassured her that none of those things would happen in his office. *Deposition of Byrd* at 245-46, 343-44.

Byrd transferred her real estate license to the Hoover Office, and on December 1, 1993, Byrd and Latham executed a new independent contractor agreement as between Byrd and the FREC Hoover Office. *Complaint* at ¶ 23; *Answer* at ¶ 23.  While working out of the Hoover Office, Byrd complains that she continued to have difficulty showing homes listed by FREC agents in the Western section.  Also, she claims that Latham told many racial jokes while Byrd was an agent in the Hoover Office.[37]

In March 1994, Shelton contacted Latham about a contract that Byrd had written.  Byrd was the selling agent for black buyers on the contract, and white FREC agent Dulaney was the listing agent for white sellers.  Shelton accused Byrd of not conducting herself in a professional manner to complete the transaction.  At the time, Byrd was doing "everything

---

[37] When Byrd transferred to the Hoover Office, six agents worked there, three of whom were black.

possible" to assist the buyer in obtaining financing. Nevertheless, the contract was voided because the buyer could not obtain financing. However, Byrd does not believe that this cancellation was racially motivated.

Also in March 1994, Byrd listed a piece of property adjacent to Compass Bank on Highway 31 in Hoover for Mr. Goswick. Ms. Byrd placed a "For Sale" sign, with her picture, on the property, but the sign was removed after about two days. An office manager at Compass Bank called Byrd and told Byrd that her manager had instructed her to remove the sign. When Byrd visited the bank, she was told that Mr. Goswick did not own the property. Byrd reported the situation to Mr. Latham and told him that she was going to put her sign back up. Latham laughed and told Byrd that president Ulbricht thought it was a joke. Signs were placed by Ms. Byrd and removed by Compass Bank several times.

On November 21, 1994, Latham received a hand-delivered letter from attorney Randolph H. Lanier, informing him that the "For Sale" sign was causing confusion among Compass customers who were concerned the bank was for sale. Mr. Lanier's letter asked Latham to remove the signs temporarily pending a determination of the true owner of the property. The letter stated that Cahaba Title had researched the title and found that Mr. Goswick received the property through a tax sale. The letter also asked that, if the signs were replaced, the new signs clearly mark the property for sale to prevent confusing Compass Bank customers. Mr. Latham ordered a larger sign that demonstrated the property for sale, and he placed it on the property. Also, two regular real estate signs were placed on the lot, which included Byrd's picture.

17

Subsequently, Randy Neal at Lawyer's Title informed Latham that Mr. Goswick could not get clear title to the property, and Mr. Neal told Byrd that Mr. Goswick did have some rights in the property. In any case, Latham took all the signs down and told Byrd that she could not sell the property. Byrd told Latham that she wanted the signs with her picture on the property for advertisement. When she asked Latham why he removed the signs, he just said "because I'm Jim Latham." Four days later, Latham told Byrd that the property did not have clear title.[38]

In connection with this incident, Latham told Byrd that she was causing havoc in Hoover and that he had to live in Hoover. He told her that it was a good old boy system, and she was bucking the system. Then, according to Byrd, Latham suggested that she leave FREC.[39]

In November 1994, a purchaser of a house listed by Byrd contacted her about obtaining repairs for a roof leak. The repair was not part of the sales contract because a new roof had been installed and completed exactly as specified in the appraiser's report. Although it was not her responsibility, Byrd attempted to resolve the matter by having the buyer attest that she was satisfied with $250.00 worth of repairs. However, Shelton told Latham that Byrd lied, that Byrd did not have the roof properly repaired, and that FREC

---

[38] Byrd reported to Latham that Mr. Neal had told her that Mr. Goswick had some rights in the property. She also told Latham that she had Mr. Goswick's title, indicating that Mr. Goswick owned the property. Latham and FREC never consulted an attorney to determine whether the property could be sold. Ultimately, president Ulbricht made the decision to take the signs down.

[39] Byrd testified that Latham suggested that she leave FREC on more than one occasion. *Deposition of Byrd* at 405. Although defendants dispute this, plaintiffs have proffered sufficient evidence to at least create a genuine dispute. *Id*; *Movants' Reply to Opponents' Additional Facts* at ¶ 289.

18

could possibly be sued. *Deposition of Byrd* at 342.  Latham told Byrd that he had to believe

Shelton in this regard because she was the broker.

Latham scrutinized Byrd's work while she was under his supervision, questioning

Byrd's secretary about her telephone calls, asking her secretary whether she was at an

appointment, and questioning Byrd or her secretary about whether Byrd was working with

a buyer or a seller.  However, Latham never had any criticism of Byrd's performance.

Byrd left FREC in February 1995.  According to Byrd, she left because of

discriminatory experiences at the Western Office and because the climate at the Hoover

Office was not an improvement.[40]  *Declaration of Byrd Under Penalty of Perjury* at ¶ 24.

Byrd also testified that she told Latham she was leaving because of his treatment of her and

that she felt his treatment was because of her race.[41]  *Deposition of Byrd* at 426-27.

## C.    Byrd's Experience after Leaving FREC.

Since leaving FREC, Byrd has continued to have difficulty with some of the agents

in the Western Office, such as Dan Delaney, Johnny Pate and Joe Fondaw, as far as

scheduling appointments and showing homes listed by those agents.  In Spring 1996, Byrd

wrote a contract with a full price offer and buyers paying all closing costs on a home in

Pleasant Grove.  This home was listed by white agent, Gloria Brown, of the FREC Western

Office.  When the contract came back to Byrd, the seller wanted something changed.

When Byrd's client agreed, the property was removed from the market.

---

[40]Although defendants dispute this, plaintiffs have proffered sufficient evidence to at least create a genuine dispute.  *Movants's Reply to Opponents' Additional Statement of Facts* at ¶ 300.

[41]Although defendants dispute this, plaintiffs have proffered sufficient evidence to at least create a genuine dispute.  *Movants's Reply to Opponents' Additional Statement of Facts* at ¶ 301.

On another occasion, Byrd represented a black couple who were interested in a home in Fair Oaks. Byrd was unable to write their contract because white FREC agent, Johnny Sharp, informed the couple that the property had an exclusive selling agent. Sharp initially told Byrd that he would provide her with a referral fee.[42] Later Sharp rescinded his offer, telling Byrd that Shelton would have a problem with the referral fee because of Byrd's lawsuit.

In June 1995, Byrd filed a complaint with the Department of Housing and Urban Development, charging racial discrimination by FREC. *Complaint* at ¶ 26.

### D.   **Humes' Tenure at FREC.**

Humes, a Birmingham native, sold real estate in Birmingham for a number of years before transferring to the FREC Western Office as a sales associate in the summer of 1991. Humes, like Byrd, contends that white agents kept her from showing their listings because of her race. In her deposition, she testified as to her "gut feeling" about this, but could not recall specific incidents. *Deposition of Humes* at 70-72. However, in evidence submitted in opposition to the defendants' motion for summary judgment, Humes recites an incident where Dan Dulaney had a listing near Highway 150 in Bessemer. *Declaration of Patricia Humes under Penalty of Perjury* at 1-2. Humes showed the home to a white couple, and expected to be the selling agent if they submitted a contract. *Id.* at 2. Instead, the potential buyers called Dan Dulaney directly and he sold the home to them. Ms. Humes received

---

[42] Agents occasionally give referrals to each other when they do not sell or list a property themselves. The referral fee is customarily twenty to thirty per cent, depending upon the agreement between the agents.

no commission on the sale. *Id.* Humes never complained to Shelton or anyone else at FREC that white agents interfered with her efforts to show their listings.

On the other hand, Humes claims that her awareness of Byrd's difficulties with showing homes in Pleasant Grove and Hueytown affected her willingness and desire to attempt to show her black clients homes in these areas. *Id.* Furthermore, Humes claims that when she heard Shelton tell Byrd not to show homes in predominantly white neighborhoods to black prospects, Humes interpreted Shelton to mean that to apply to all black agents. *Id.*

Shelton wanted Humes to convey to Byrd that certain areas were not ready for change. *Deposition of Humes* at 111-16. Humes told Shelton that Byrd is from up north, that there is "no certain side of town" for Byrd. *Deposition of Byrd* at 210. Humes would not tell Byrd that "she should take her people somewhere else." *Deposition of Humes* at 111-12. Humes told Shelton that the law allowed an agent to show a person anything the agent wanted to show. *Id.* at 112.

Humes believes that she was not given the same assistance from FREC as other agents. *Id.* at 56. Humes says that an incident sometime in 1992 illustrates her point; Humes asked Shelton to help her with a problem, and Shelton referred her to sales associate Steve Long, who could not assist Humes.

Shelton "talked down" to Humes and other black agents in the Western Office. According to Humes, white agents treated black agents as if they "better be glad that you're here, and they separate themselves from black agents." *Id.* at 64. On the other hand, Shelton did not refer to Humes as a "fish-eyed fool," and Humes never told Shelton

21

that the term "fish-eyed fool" was offensive to her. Humes never heard any FREC agents make any racial slurs or racial gestures.

Humes also contends that she did not receive an equal share of OT business because of her race. Humes testified that she only received one OT call from a white prospect. *Id.* at 121-22. Humes described the situation: "With First Real Estate being as big of a company as it is and everything geared toward the white market, all the advertising and everything being geared toward the white market, it seems as if though I would have gotten at least a few white clients to buy houses with me." *Id.* at 121.

Humes also makes allegation of discrimination based upon specific events. First, in 1992, Humes wrote a sales contract for a black buyer, Bernard Wright, on a piece of property which was listed by a white FREC agent, Dan Dulaney. After receiving the contract, Dulaney informed Shelton that he believed he was entitled to the entire commission because he had first shown the property to Mr. Wright.[43] However, Wright had told Humes that he was not treated well by Mr. Dulaney, and therefore asked Humes to show him the property. After the sale closed, FREC held an arbitration, in March 1992, to determine who was entitled to the commission. The arbitrator determined that Ms. Humes was entitled to the selling commission.

On another occasion, Humes claims that she was denied use of funds in the FREC advertising budget. Each sales agent in the FREC Western Office gets credit from FREC

---

[43] Dulaney did not tell Humes that he wanted the entire commission before he complained to Shelton. Humes told Shelton that she was entitled to the sales commission and that Dulaney's actions toward her were racially motivated. According to Humes, Shelton sided with Dulaney in his attempt to obtain the sale commission. *Deposition of Humes* at 76-77.

for his or her own use in advertising in the amount of ten percent of company dollars he or she generates. As each agent advertises, the amount of credit consumed is deducted from his or her account. The fiscal year at FREC runs from December 1 to November 31 of each year.[44] Before the end of the fiscal year, Humes wanted to use $800 in her advertising budget to advertise during the holidays, but she was not permitted to use her allotment in this way. As a result, Humes lost advertising exposure during the holidays.

In January 1994, Humes wrote a contract proposal for her client, Paula Walton, offering to purchase property, accompanied by $500 in earnest money from the purchaser. Humes gave the earnest money to Shelton, who signed off as the broker on the HUD contract. Then Humes received a receipt from the receptionist, Lyn. However, Walton's bid was not accepted, and she was therefore due a return of her earnest money. Walton came to the FREC office to reclaim the money, but Lyn could not find a copy of the receipt. When questioned about it, Shelton insisted that Humes had never given her the earnest money. Humes was forced to go back to her client for the receipt to prove to Shelton that she had given the earnest money to Shelton. As a result of this incident, Shelton asked Humes to leave voluntarily or she would transfer her license.[45]

---

[44] The parties dispute whether funds in each agent's account rolls over from year to year. Receptionist Vicki Lucas, whose duties included crediting and debiting each account, understood that an ad must be commissioned before the end of the fiscal year, but not necessarily run before the end of the year in order to be paid for out of the agent's account balance for that year. *Deposition of Lucas* at 83-84, 90.

[45] First, defendants claim, without evidentiary support and without details of the claim, that Shelton asked Humes to leave because of an impropriety handling funds from the "Smithfield Revitalization Project." *Movants' Initial Submission in Response to the Court's Order* at 7. Then, defendants admit that Shelton asked Humes to leave FREC because of the lost Walton earnest money. *Movants' Reply to Opponents' Additional Statement of Facts* at ¶ 250. Finally, defendants admit that Shelton did not confront Humes about the Smithfield Project, and Shelton did not ask Humes to leave because of the Smithfield Project. *Id.* at ¶ 257.

Humes thereafter met with Latham about transferring her license to the Hoover office. She also interviewed with the broker at the FREC Eastern Office. Both brokers told Humes that, after speaking to Shelton, they would not transfer her to their offices. On January 21, 1994, Shelton wrote Humes a letter stating, "I feel that this is in the best interest for you and First Real Estate that it is time for you to change companies." *Opponents' Evidence Submitted in Response to Exhibit D of the Court's Order* at Exhibit 17.

Humes left FREC on January 24, 1994, transferring her license to Barnes and Associates. She was "totally disappointed" in what happened at FREC, and was discouraged because she was not allowed to transfer to another FREC office. *Deposition of Humes* at 208, 211. While Humes attempted to "get a start going with Barnes," she "just didn't have the fire after dealing with First Real Estate." *Id.* at 211. After four months at Barnes and Associates, Humes left the real estate business entirely.

**E.     FREC Fair Housing Policy.**

Plaintiffs filed this action in this court on November 29, 1995. *Complaint* at 1. In 1996, FREC began to require its advertising, including display ads, classified ads, brochures, billboards, signs, business cards and personal promotional material, to contain the equal opportunity slogan or logo. Subsequent to the Byrd and Humes complaint, Shelton directed the publisher of "The Real Estate Book," which advertises properties in the western area of Birmingham, to display the equal housing logo on all FREC advertising.

24

Based primarily upon the complaints of Byrd and Humes, the Greater Birmingham Fair Housing Center ("Center")[46] investigated the real estate practices of FREC. Plaintiffs' evidentiary support for their opposition to the defendants' motion for summary judgment includes numerous alleged facts derived from the Center's testing at FREC— facts that are generally not relevant determination of the defendant's motion for summary judgment as to the claims against FREC.

## III.   Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in

---

[46] The Greater Birmingham Fair Housing Center describes itself as a private, non-profit organization in Birmingham, Alabama, which is funded primarily by the United States Department of Housing and Urban Development. The Center's purpose is to support and encourage equal opportunities in housing in the greater Birmingham metropolitan area. It engages in a number of activities to identify barriers to fair housing and to eliminate discrimination in housing in Birmingham. The Center assists persons in obtaining equal access to housing by receiving and investigating complaints of housing discrimination and by investigating and testing local real estate companies.

support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same

standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion.

### A.    Statute of Limitations.

Defendants argue that some, if not all, of plaintiffs claims are time barred. Defendants assert, and plaintiffs do not dispute, that the applicable limitations period for all claims in this action is two years. *Movants' Initial Submission in Response to Exhibit*

27

*D of the Court's Order* at 18; *Opponents' Responsive Submission in Response to Exhibit D of the Court's Order* at 11-15, 19-21. The FHA provides that "an aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the *occurrence* or the *termination* of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A) (emphasis added). Sections 1981 and 1982 do not contain such explicit provisions for a time limitation. However, courts have adopted the statute of limitations from relevant state law, which in Alabama is two years.[47] Therefore, all claims in this action are limited by a two-year time bar.

---

[47] The Supreme Court held, for actions brought under § 1981, federal courts should look to the applicable state law in determining the statute of limitations. *Burnett v. Grattan*, 468 U.S. 42 (1984). As for claims under § 1983, in *Wilson v. Garcia*, the Court held that because § 1983 claims are in essence claims for personal injury, the state statute applicable to personal injury should be borrowed. 471 U.S. 261, 270-80 (1985). Three years later, the Supreme Court extended the *Wilson* rationale to § 1981 actions. *Goodman v. Lukens Steel Co.* 482 U.S. 656, 660-65, (1987); *see also Baker v. Gulf & Western Industries, Inc.*, 850 F.2d 1480, 1481 (11th Cir. 1988) (applying *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987) retroactively). However, this did not completely resolve the issue for states like Alabama with different statutes of limitations for different types of personal injury. Ala. Code § 6-2-34(1) (1975) (six year statute of limitations for "trespass to person or liberty, such as false imprisonment or assault or battery"); *Id.* at § 6-2-38 (two year statute of limitations for other personal injury).

In 1989, the Supreme Court addressed that point in *Owens v. Okure*, at least as to § 1983 claims. 488 U.S. 235 (1989). The Court held that, in states with multiple limitations periods for personal injury actions, the proper period for § 1983 actions is the state's general or residual personal injury statute of limitations. *Id.* at 236. In Alabama, that general or residual personal injury limitation is two years. Ala. Code § 6-2-38(l) (1975); *Ex parte Grubbs*, 542 So. 2d 927 (Ala. 1989); *see also Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1484 (11th Cir. 1989) (applying *Owens v. Okure*, 488 U.S. 235 (1989) to Alabama law); *Andalusia City Bd. of Educ. v. Andress*, 916 F. Supp. 1179 (M.D. Ala. 1996) (two-year personal injury statute of limitations applies to § 1983 claims in Alabama).

That *Owens* also applies to § 1981, as well as § 1983, seems almost certain, notwithstanding the fact that § 1981 concerns contract rights. *Cf. Goodman*, 482 U.S. at 660-65 (recognizing the shared historical derivation of §§ 1981, 1982, and 1983). At least one Alabama federal court has said, in dicta, that it does. *Grooms v. Wiregrass Elec. Coop., Inc.*, 883 F. Supp. 643, 647 n.4 (M.D. Ala. 1995) (DeMent, J.). This court agrees that a two-year statue of limitations applies to § 1981 claims in Alabama.

As for § 1982 claims, courts in the Eleventh Circuit have not explicitly addressed the proper statute of limitations, but numerous federal courts have. These courts have unanimously concluded that since "actions brought pursuant to § 1982 are [,like § 1981 and § 1983,] best characterized as personal injury actions," the most appropriate state statute of limitations for section 1982 actions is also the statute applicable to personal injury actions. *Scheerer v. Rose State College*, 774 F. Supp. 620, 622 (W.D. Okla. 1991), *aff'd*, 950 F.2d 661 (10th Cir. 1991), *cert. denied*, 505 U.S. 1205 (1992); *see also Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1528 (7th Cir. 1990). Therefore, this court will also apply a two-year statute of limitations to this § 1982 claim arising in Alabama.

28

Byrd and Humes filed this lawsuit on November 29, 1995. Therefore, strict application of the statute of limitations would bar claims arising from acts of the defendants which occurred before November 29, 1993. Strict application of the limitations period would exclude any possible discriminatory acts of the defendant against Byrd while she worked at the Western Office because she transferred to Hoover before November 29, 1993. Also excluded by strict application of the statute of limitations are any possible discriminatory acts of defendants against Humes during the first two and one half years of her work at FREC.

Plaintiffs, however, assert that all their claims are not time barred because they are parts of "continuing violations" that did not terminate outside the two-year limitation period. In a lawsuit claiming that defendant engaged in continuous course of conduct that caused damage, plaintiffs can recover for damages that preceded the limitations period if they stem from a persistent process of illegal discrimination. *Tyus v. Urban Search Management*, 102 F.3d 256, 265-66 (7th Cir. 1996), *reh'g denied*, Jan. 6, 1997, *cert. denied*, 117 S. Ct. 2409 (1997).

In determining the existence of a continuing violation, the court looks to several factors, including (1) the subject matter, whether the acts involve similar types of discrimination, (2) the frequency, whether the acts are isolated incidents or everyday occurrences, and (3) the degree of permanence, whether the act is likely to trigger the victim's awareness of and duty to assert her rights. *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 80-01 (11th Cir. 1988); *Clark v. City of Macon, Ga.*, 860 F. Supp. 1545, 1550 (M.D. Ga. 1994). The continuing violation exception is most typically applied to an action

like a hostile environment claim, where the charge, by its own terms, necessitates a pattern of incidents occurring over an extended period and where often the unlawfulness is not apparent until the incidents can be viewed in the aggregate. *Hull v. Case Corp.*, 1993 WL 603554 (S.D. Fla. 1993)(unpublished); *see e.g., Stockett v. Tolin*, 791 F. Supp. 1536 (S.D. Fla. 1992) (allowing the plaintiff to plead incidents spread over several years, where those incidents taken together created a hostile environment and where the last of those incidents occurred within the limitations period).

Furthermore, a continuing violation is not merely the perpetuation of the effect of a previous act of discrimination committed outside of the filing period.[48] *United Airlines v. Evans*, 43 I U.S. 553, 558 (1983). Nor is it an unconnected string of discrete discriminatory acts against the plaintiff. *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983), *cert. denied*, 479 U.S. 868 (1986). The victim cannot sit back and permit violations to accumulate, especially when she was aware of her rights.[49]

---

[48] The case of *Knight v. Columbus, Ga.*, apparently enunciates the present state of the law in this regard. There, the court, quoting *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir. 1980), stated:

> "[T]he critical question is whether any present violation exists. . . . [W]here the employer engaged in a discrete act of discrimination [outside the limitations period], allegations that the discriminatory act continues to adversely affect the employee or that the employer [presently refuses to rectify its past violation will not satisfy the statute of limitations]." *Gonzalez*, 610 F.2d at 249 (citations omitted). The critical distinction in the continuing violation analysis therefore, is whether the plaintiffs complain of "the present consequence of a one time violation, which does not extend the limitations period, [or] the continuation of that violation into the present, which does." *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993) (citations omitted).

*Knight v. Columbus, Ga.*, 19 F.3d 579, 580-581 (11th Cir. 1994), *cert. denied*, 15 S. Ct. 318 (1994) (applying Title VII cases to the Fair Labor Standards Act).

[49] In *Roberts v. Gadsden Memorial Hospital*, the Eleventh Circuit considered whether the acts of the defendant in 1978 were time-barred, even if they were part of a continuing violation, but when the plaintiff was aware of his rights in 1978. 850 F.2d 1549, 1550, (11th Cir. 1988). The court said:

Nevertheless, the Supreme Court has recognized continuing violations in the context of the Fair Housing Act. In *Havens Realty Corp. v. Coleman*, the Court found claims arising from several separate alleged acts of housing discrimination, which occurred outside the statute of limitations period, were not time barred because "a 'continuing violation' of the Fair Housing Act should be treated differently from one discrete act of discrimination."[50] 455 U.S. 363, 380 (1982). The claims in *Coleman* included "neighborhood" violations, which deprived the plaintiffs of the benefits of interracial association. *Id.* at 365. Two "tester plaintiffs" alleged incidents of "racial steering," under § 3604(d) of the FHA, against the owner and operator of apartment complexes. *Id.* at 368. Even though all the alleged incidents involving these two plaintiffs fell outside the statutory limitations period,[51] their "neighborhood" claims were not time-barred because at least one similar incident involving a different plaintiff was within the limitations period. *Id.* at 369, 380. Therefore,

---

[E]ven if we assume that the 1978 discriminatory act continued into the statutory filing period, we must still conclude that [plaintiff's] claim based on the incident is time barred. [Plaintiff] admitted that he was aware of his rights in 1978. He could have asserted them at that time. To the extent that [defendant] injured him on a continuing basis as a result of the 1978 incident, it was only because he knowingly failed to exercise his rights. A claim arising out of an injury which is continuing only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period. *Id.*

[50] The Court went on to say:

Statutes of limitations such as that contained in § 812(a) are intended to keep stale claims out of the courts. *See Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314, 65 S. Ct. 1137, 1142, 89 L. Ed. 1628 (1945). Where the challenged violation is a continuing one, the staleness concern disappears. Petitioners' wooden application of § 812(a), which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the Act, *see Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 417, 88 S. Ct. 2186, 2191, 20 L. Ed. 2d 1189 (1968). *Cf. Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982); *Coleman*, 455 U.S. at 380.

[51] This case was decided under the 180 day statutory limitation of 42 U.S.C. § 3612(a) (Act Apr. 11, 1968, P.L. 90-284, Title VIII, § 812, 82 Stat. 88), repealed by Act Sept. 13, 1968, P.L. 100-430, § 8(2), 102 Stat. 1625.

according to the Court, the on-going policy of racial steering continued through the last alleged incident. *Id.* at 380; *see also Heights Community Congress v. Hilltop Realty, Inc.*, 629 F. Supp. 1232 (N.D. Ohio 1983); *aff'd*, 774 F.2d 135 (6th Cir. 1985), *cert. denied*, 475 U.S. 1019 (1986) (continuing violation where at least one of eight racial steering incidents occurred within the limitations period).

On the other hand, the claim of one "tester" plaintiff who alleged injury from false information given by the defendant, under the same provision, § 3604(d) of the FHA, was not, and could not be, a part of the continuing violation of "racial steering." *Id.* at 381. Rather, the claim arising from an isolated incident of misinformation must independently satisfy the limitations period. *Id.*

Finally, whether alleged discriminatory acts constitute a continuing violation is a finding of fact. *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 448 (11th Cir. 1993); *Patterson v. Augat Wiring Systems, Inc.,* 944 F. Supp. 1509, 1518 (M.D. Ala. 1996). However, as always, if there is no reasonable factual inference, the issue must be determined as one of law.

A reasonable factual inference does exist that alleged discriminatory practices of defendants formed a pattern of discrimination that injured these claimants. Humes and Byrd present evidence that defendants participated in agents "steering"[52] their clients from

---

[52]"Steering" was defined by the Supreme Court, in *Gladstone Realtors v. Village of Bellwood,* as "directing prospective buyers interested in equivalent properties to different areas according to their race." 441 U.S. 91, 94 (1979).

homes in certain neighborhoods, in "grudging"[53] by racially motivated home owners who

listed their properties with the defendants, in distributing walk-in and phone referrals in a

discriminatory manner, and in other conduct toward the plaintiff. Even though the alleged

conduct began before November 29, 1993, it extended to within the two year statute of

limitations in this case. After Byrd left the Western Office and even after she left FREC,

evidence suggests that she continued to have difficulty showing homes in Hueytown and

Pleasant Grove. Considering the similarity, the frequency, and the severity of each

individual act, a reasonable jury could find a continuous course of conduct by these

defendants against these claimants.

## **B.    Plaintiffs' Enumerated Claims.**

The complaint sets out seven enumerated claims by both plaintiffs against all

defendants. *Complaint* at 9-12.

### **1.    Claims Under FHA § 3604.**

As to plaintiffs' first claim that conduct of the defendants violated plaintiffs' rights

under § 3604 of the FHA, this section makes unlawful a refusal to sell or negotiate for sale

of a dwelling because of race. *Complaint* at 9-10; 42 U.S.C. § 3604(a). It covers blatant

refusal to sell for prohibited reasons, as well as more subtle techniques. *See e.g. Heights*

*Community Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985) (real estate

---

[53] A refusal to negotiate can take the form of "grudging" sales techniques inconsistent with ordinary business practices. *See e.g. Seaton v. Sky Realty Co, Inc.*, 491 F.2d 634, 636 (7th Cir. 1974) (realtor told black buyers property was sold but could not produce an accepted offer and remained uncooperative and discouraging); *Wang v. Lake Maxinhall Estates, Inc.*, 531 F.2d 832, 836 (7th Cir. 1976) (full price offer ignored). "Grudging" may also include efforts to make minority applicants feel unwelcome. *U. S. v. Pelzer Realty Co.*, 484 F.2d 438, 442 (5th Cir. 1973), *cert. denied*, 416 U.S. 936 (1974) (grudging acceptance of blacks in contrast to otherwise aggressive sales techniques); *U.S. v. Real Estate Dev. Corp.*, 347 F. Supp. 776, 782 (N.D. Miss. 1972) (owner created an all white discriminatory image).

agent did not offer to show black prospective buyer other homes when only black owned home became unavailable); *Watts v. Boyd Properties, Inc.*, 758 F.2d 1482, 1484 (11th Cir. 1985) (agent told black applicant no vacancies were available but told white applicant apartment was available within weeks). "Racial steering" is prohibited by this provision. *See Zuch v. Hussey*, 394 F. Supp. 1028, 1048 (E.D. Mich. 1975), *aff'd*, 547 F.2d 1168 (6th Cir. 1977) (agent's affirmative attempt to influence client, even though client initiated conversation about racial composition of neighborhood).

Section 3404 also prohibits other subtle techniques of discrimination such as altering the terms and conditions of a sale or altering the provision of services and facilities to potential home buyers. 42 U.S.C. § 3604(b). Thus, this provision addresses those who discriminate, not by outright refusal to sell, but by offering less favorable terms and conditions. *See U.S. v. Pelzer Realty Co.*, 484 F.2d 438, 441, 443 (5th Cir. 1973) (only black buyers required to pay closing costs). Section 3604 prohibits advertising that directly or implicitly expresses a racial preference including oral statements of racial preference. 42 U.S.C. § 3604(c); *see U.S. v. L & H Land Corp.*, 407 F. Supp. 576, 580 (S.D. Fla. 1976) (statement of agent that black persons are not permitted on premise). Finally, § 3604 confers a legal right to "all persons" for truthful information about the availability of housing. 42 U.S.C. § 3604(d); *Coleman*, 455 U.S. 363 (1982); *Pelzer*, 484 F.2d at 444 (deceptive placement of "sold" signs in front of houses).

Considering the undisputed facts in this case, and construing all the disputed facts in a light most favorable to the plaintiffs, a reasonable jury could find violations of § 3604 of the FHA with regard to the claims of both plaintiffs.

## 2.    Claims Under FHA § 3605.

As to plaintiffs' second claim that conduct of the defendants violated plaintiffs' rights under § 3605 of the FHA, this section formerly addressed only discrimination in financing and insuring housing. *Complaint* at 10; 42 U.S.C. § 3605 (1968); *see Steptoe v. Beverly Area Planning Ass'n,* 674 F. Supp. 1313, 1322 (N.D. Ill. 1988); *Ivey v. U.S.,* 873 F. Supp. 663, 671 (N.D. Ga. 1995) (applying the former § 3605). However, in 1988, Congress amended this narrow section and substituted broad language prohibiting discrimination "against any person in making available ['a residential real estate transaction']," including selling or brokering of residential real property. 42 U.S.C. § 3605 (a), (b)(2) (as amended Sept. 13, 1988, P.L. 100-430, § 6(c), 102 Stat. 1622).

Plaintiffs claim that they are protected by this provision, and defendants make no argument that it does not now apply to these real estate agents as "any persons" under the statute. Furthermore, the court finds no reason that § 3605, as amended, does not apply to the parties in this case. The plaintiffs have presented evidence that this section of the FHA was violated by acts such as unlawful steering practices, race-based telephone referrals and interference with contractual transactions on the basis of race. Therefore, as a matter of law, a reasonable jury could find violations of this section of the FHA with respect to these plaintiffs.

## 3.    Claims Under FHA § 3606.

Plaintiffs also claim the defendants violated their rights under § 3606 of the FHA. *Complaint* at 10-11; 42 U.S.C. § 3606. This section makes it unlawful to deny "access to or membership or participation in any multiple-listing service, real estate brokers'

35

organization, or other service, organization or facility relating to the business of selling"
homes. 42 U.S.C. § 3606. In addition to its obvious coverage, this section has been applied
to create a cause of action for discriminatory failure to hire by a real estate management
company. *Favors v. MAQ Management Corp.*, 753 F. Supp. 941, 948 (N.D. Ga. 1990).

Plaintiffs argue, among other things, that they were denied full access to the listings
in the multiple-listing service and access to walk-in and phone referrals in violation of this
section. Based upon the undisputed facts, and construing them in a light most favorable
to the plaintiffs, a reasonable jury could find violations of § 3606 of the FHA.

### 4.     **Claims Under FHA § 3617.**

Plaintiffs claim the defendants retaliated against them in violation of § 3617 of the
FHA. *Complaint* at 11; 42 U.S.C. § 3617. Section 3617 protects "any person" from coercion,
intimidation, threats, or interference with respect to exercise of the rights protected by the
Act. 42 U.S.C. § 3617. The FHA protects persons who exercise their rights as well as
persons who aid or encourage persons who exercise such rights. *Id; see Meadows v.
Edgewood Management Corp.*, 432 F. Supp. 334, 335 (W.D. Va. 1977). Real estate
personnel state a cause of action under § 3617 when they claim alterations in the terms and
conditions of their employment based upon their refusal to implement their employer's
racially discriminatory housing policies. *Smith v. Stechel*, 510 F.2d 1162, 1163 (9th Cir.
1975); *Wilkey v. Pyramid Constr. Co.*, 619 F. Supp. 1453, 1454-55 (D.Conn. 1985).

Ms. Byrd has produced evidence that she "aided and encouraged" others to
exercise their rights to equitable access to housing. For example, evidence suggests that,
despite admonitions from Shelton, Byrd showed her black clients homes in white

neighborhoods, in which there was a history of racial animus exhibited toward black persons who sought to move into those neighborhoods. Other evidence suggests that Byrd suffered alterations in the terms and conditions of her employment, including transfer to another office and perhaps her discharge. A reasonable jury could find that Byrd's rights under § 3617 were violated because of attempts to exercise her rights and her efforts to "aid and encourage" others to exercise their rights under the FHA.

Humes alleges that Byrd's frustration with showing houses in Hueytown and Pleasant Grove, as well as comments by Shelton about blacks in those areas, "discouraged" her from showing homes to her clients in those areas, which would be an exercise of her rights under the FHA. Ms. Humes further alleges that any attempt to sell homes to her clients in Pleasant Grove and Hueytown she believed would be futile. As a result, according to Humes, the defendants "interfered" with the exercise of her rights under the FHA, in violation of § 3617. Finally, Humes contends that she was discriminatorily discharged. Based upon the evidence, a reasonable jury could find that Humes' rights under § 3617 were violated because of her attempts to exercise her rights under the FHA .

### 5. **Claims Under 42 U.S.C. § 1981.**

Plaintiffs next claim that the defendants refused to contract with them on the same basis as white persons, in violation of their rights under 42 U.S.C. § 1981, *Complaint* at 11. That section prohibits discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981. In the employment context, § 1981 protects workers from racially discriminatory practices of their employers. *See Williams v. DeKalb County*, 577 F.2d 248 (5th Cir. 1978), *on reh'g*, 582 F.2d 2; *Cross v. Bd. of Ed. Of Dollarway*, 395 F. Supp. 531 (E.D. Ark. 1975).

37

In the housing context, § 1981 protects persons from the denial of housing opportunities based upon racial considerations. *See Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3rd Cir. 1977), *cert. denied*, 435 U.S. 908; *Morgan v. Parcener's, Ltd.* 493 F. Supp. 180 (N.D. Okla. 1978); *Avery v. City of Chicago*, 501 F. Supp. 1 (N.D. Ill. 1978).

Plaintiffs contend the defendants violated their rights under this section because of discriminatory limitations concerning where and on what conditions they were permitted to sell or to attempt to sell houses to their clients, discrimination in telephone referral policies and practices, and discriminatory limits on their use of office facilities. Based upon the available evidence, a reasonable and rational jury could conclude that plaintiffs' rights under § 1981 were violated by the defendants.

### 6.    Claims Under 42 U.S.C. § 1982.

Plaintiffs next claim the defendants violated their rights under 42 U.S.C. § 1982, which is intended to eliminate all racial barriers in the acquisition of property. *Complaint* at 11-12; 42 U.S.C. § 1982; *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). Section 1982 is broad in scope, encompassing discrimination in the sale of housing, in terms, conditions and services related to property transactions, and in racially motivated intimidation and coercion. *Jones*, 392 U.S. at 413; *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431 (1973); *Strigus v. Benoit*, 720 F. Supp. 119, 121-22 (N.D. Ill. 1989).

While there is substantial overlap between the two, the FHA and § 1982 are independent of each other; the same conduct may violate both; and such conduct may be redressed under both in the same action. *Tillman*, 410 U.S. 431; *Sullivan*, 396 U.S. at 240.

38

The principle substantive difference for purposes of this action is that the requirement for proof of discriminatory intent under § 1982 may be different from that of the FHA.[54] Nevertheless, considering undisputed facts and construing disputed facts in a light most favorable to the plaintiffs, evidence in this case is sufficient for a reasonable jury to find purposeful discrimination. For this reason and reasons discussed in consideration of the FHA claims, a reasonable jury could find the plaintiffs' rights under § 1982 were violated.

### 7. Claim for Outrage.

Lastly, plaintiffs claim that the conduct of the defendants was so extreme and outrageous as to amount to the intentional infliction of emotional injury. *Complaint* at 12. The tort of outrage was first defined by the Alabama Supreme Court in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980). The court stated, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress." *Id.* at 365. The court emphasized that the tort was reserved for "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."

---

[54] In *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, the Supreme Court held that claims brought under § 1981, the companion statute to § 1982, require proof of purposeful discrimination. 458 U.S. 375, 382-91 (1982). Because § 1981 and § 1982 tend to be interpreted in parallel fashion, most lower courts have read *General Bldg. Contractors* as authority for the proposition that § 1982 claims also require proof of discriminatory intent. *See Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Hamilton v. Svatik*, 779 F.2d 383, 387-88 (7th Cir. 1985).

Under the FHA, neither Congress nor the Supreme Court has conclusively resolved whether evidence of "disparate impact," without direct evidence of intent to discriminate, is sufficient to demonstrate a violation. However, at least one court has analogized the proof requirement under the FHA to the standard under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, *et seq.*; *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533-34 (7th Cir. 1990) (unexplained discriminatory effect may support an inference of discriminatory intent, but discriminatory effect is not, by itself, a violation).

*Id.* Because the cause of action is available only in the most egregious circumstances, very few cases present a question for the jury. *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). A determination as to whether conduct is sufficiently objectionable to support a cause of action for outrage may be made by the trial court as a matter of law. *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 123 (Ala. 1985).

None of the conduct complained of in this action satisfies this stringent standard. Based upon all the undisputed facts and construing all disputed facts in a light most favorable to the plaintiffs, no reasonable jury could find for the plaintiffs on their claims of outrage. Accordingly, the defendants are entitled to judgment as a matter of law, and the plaintiffs' outrage claims will be dismissed with prejudice.

### C.    **Defendants' Liability.**

Byrd and Humes each claim injury from four separate and distinct defendants. The liability of each defendant to each plaintiff is considered separately.

#### 1.    **Claims Against FREC.**

Defendant FREC is a residential and commercial real estate company. Private real estate companies are liable for violations of the FHA, § 1981 and § 1982. *Northside Realty Associates v. United States*, 605 F.2d 1348 (5th Cir. 1979) (under FHA); *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 2961 (1993) (under § 1981); *Sanders v. Dorris*, 873 F.2d 938 (6th Cir. 1989) (under §

40

1982). Two theories of liability may apply: 1) respondeat superior based upon a master-servant relationship,[55] and 2) direct liability based upon general agency principles.[56]

Under the theory of respondeat superior, a company may be held liable for acts of its employees if it knew or should have known of any illegal discrimination. *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1512 (11th Cir. 1989).   Under general principles of agency law, the principal is not liable for acts of an independent contractor. However, under the FHA, this question is controlled by federal law, and a company may be liable for the acts of its "independent contractors," particularly where the company retains a certain amount of control. *Northside*, 605 F.2d at 1354; *Heights Community Congress v. Hilltop Realty*, 774 F.2d 135, 141 (6th Cir. 1985), *cert. denied*, 106 S. Ct. 1206 (1986); *Moore v. Townsend*, 525 F.2d 482, 485 (7th Cir. 1975).  In *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.*, the Seventh Circuit applied the doctrine of respondeat superior to impose liability on a real estate firm even though its agents were

---

[55] At common law, liability for the tortuous acts of a servant is imputed to the master, despite the absence of any wrongdoing on the part of the master. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 69, at 499-500 (5th ed. 1984). This principle is applied to violations of the FHA, § 1981 and § 1982. *Northside Realty Associates, Inc. v. U.S.*, 605 F.2d 1348, 1353-54 (5th Cir. 1979) (real estate company liable under the FHA for acts of its agents when acts were carried out within the scope of employment and for the benefit of the company); *City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.*, 982 F.2d 1086, 1096-97 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 2961 (1993) (doctrine of respondeat superior applied to real estate firm to impose liability for acts of agents under § 1982 and FHA); *cf. General Bldg. Contractors Assoc., Inc. v. Pennsylvania*, 458 U.S. 375 (1982) (union and trade association not vicariously liable for lack of agency or employment relationship); *but cf. Flanagan v. A.E. Henry Community Health Services Ctr.*, 876 F.2d 1231, 1236 (5th Cir. 1989) (although rejecting district court's characterization of employer's liability in terms of respondeat superior, court relies on agency principles to affirm corporate liability for deliberate acts of supervisors where principal exercised almost exclusive control over agent).

[56] Under general agency principles, a corporate defendant is directly liable for the acts of its agent so long as the agent acts for the principal with proper authority. Restatement (Second) of Torts § 140 (1957). This principle is applied to violations of the FHA, § 1981 and § 1982. *Northside*, 605 F.2d at 1353 (5th Cir. 1979) (real estate company liable under the FHA for acts of its leaders and policy makers); *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1512 (11th Cir. 1989) (corporate employer liable in § 1981 claim either under respondeat superior theory or general agency principles, which hold employer liable for acts of supervisors).

described as independent contractors and were specifically instructed not to discriminate. 982 F.2d 1086, 1096-97 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 2961 (1993). Because of the significance of "control" by the principal, regardless of how the parties characterize the relationship, the facts of the particular case become critical in determining liability.

In this case, FREC may be liable for any discriminatory acts of its sales agents that injured Byrd or Humes. Sales agents at FREC work under a contract styled as the "Broker-Sales Associate Independent Contractor Contract." Nevertheless, FREC may still be liable for the acts of its sales agents if it maintained sufficient control over their actions. Furthermore, a reasonable jury could conclude that FREC had notice, actual or constructive, of its sales agents' actions toward the plaintiffs. Finally, a reasonable jury could conclude that the actions of FREC sales agents were racially motivated and that those actions injured the plaintiffs.

FREC may also be liable for any discriminatory acts of its broker-managers, Shelton and Latham. Whether FREC broker-managers are employees of FREC is an easier question than whether FREC sales agents are employees for the purpose of corporate liability. FREC broker-managers worked under an "Employment Contract" and were compensated based upon the sales performance of their respective offices. Furthermore, a reasonable jury could conclude that Shelton and/or Latham participated in a course of conduct that was racially motivated and injured Byrd and/or Humes.

Under the theory of direct liability, the company cannot claim lack of notice as a defense so long as the actor is an agent of the company with proper authority to act for the company. *Vance,* 863 F.2d at 1514. A company may be directly liable, not only for the acts

of its corporate officers, but for the acts of a supervisory employee who has proper

authority to act for the company. *Id.* at 1515. Under this theory, FREC may be liable for

violations by its president, Ulbricht, as its agent, and by its broker-managers, Shelton and

Latham, if they acted with the requisite authority. Therefore, considering all the facts of this

case not in dispute, and construing the disputed facts in a light most favorable to the

plaintiffs, a reasonable jury could find FREC liable under one or more of the causes of

action pled by the plaintiffs.

### 2.    **Claims Against Fred Ulbricht.**

Defendant Ulbricht is president of the corporate defendant but is also named in his

individual capacity. Private individuals are liable for their own actions under the FHA, §

1981 and § 1982. 42 U.S.C. §§ 3601, *et seq.*; 42 U.S.C. § 1981(c), as amended; *Jones v.*

*Alfred H. Mayer*, Co. 392 U.S. 409 (1968). In the Fifth Circuit, when corporate officers

directly *participate in or authorize* the commission of a wrongful act, even if the act is done

on behalf of the corporation, they may be personally liable.[57]   *Moss v. Ole South Real*

---

[57]Defendants contend that "[w]hile it is true that courts have held the officers of a company liable under the FHA and §§ 1981 and 1982, they should *only* be responsible where they have directly participated in the discriminatory conduct." *Movants' Initial Submission* at 21(emphasis added). In support of this position, defendants cite authority from the Fifth Circuit, *Moss v. Ole South Real Estate, Inc.,* 933 F.2d 1300, 1312 (5th Cir. 1991) and *Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375, 381 (5th Cir. 1988).

    *Johnson* does not stand for the proposition that a corporate officer must directly participate in discriminatory conduct in order to be personally liable. What *Johnson* does stand for is the proposition that personal liability, under § 1981, requires intent to discriminate. In *Johnson*, the individual defendant, a school district superintendent, recommended that the plaintiff, a black teacher, not be rehired. *Id.* at 381-82. Nevertheless, the individual defendant was not liable under § 1981 because he relied upon evaluations supplied by the plaintiff's supervisors and he was unaware that similarly situated white teachers received counseling for alleged inadequate performance while the plaintiff did not. *Id.* at 382. Therefore, according to the *Johnson* court, the superintendent was not personally liable because there was no inference of intentional discrimination by him. *Id.*

    *Moss*, which defendants cite, also does not support the proposition that officers of a company are liable under § 1981 and § 1982 "only" if they directly participate in the discriminatory conduct. 933 F.2d 1300 (5th Cir. 1991). Rather, the *Moss* court reversed the lower court's determination that the president and sole shareholder of a real estate company was not individually liable despite the fact that he directly participated in the alleged

*Estate, Inc.,* 933 F.2d 1300, 1312 (5th Cir. 1991) (emphasis added).  Furthermore, in binding

precedent in this circuit, officers are individually liable if they either *encouraged* or *could*

*have prevented* the discriminatory conduct of subordinates.  *Northside*, 605 F.2d at 1354

(emphasis added).

In this case, based upon the evidence before the court, a reasonable jury could not

find that Ulbricht participated in or authorized the conduct about which Ms. Byrd

complains which occurred after May 1993. The parties do not dispute that Byrd, on several

occasions, reported incidents of alleged discriminatory acts to Ulbricht in May 1993.

Although Ulbricht contends that "it wasn't a valid complaint," a reasonable jury could find

that the complaint was valid and that Ulbricht "could have prevented" further

discriminatory conduct toward Byrd. On the other hand, there is no evidence that Ulbricht

had any knowledge of the alleged discriminatory conduct about which Humes complains.

Therefore, no reasonable jury could find Ulbricht personally liable to Humes.

Accordingly, as matter of law, Humes' claims against the individual defendant

Ulbricht are due to be dismissed on his motion for summary judgment. Additionally, as a

matter of law, Ulbricht is not personally liable to Byrd for any alleged discriminatory

conduct toward Byrd occurring before May 1993 because there is no evidence that he was

---

discriminatory transaction.  *Id.* at 1312. The *Moss* court found individual liability for this corporate officer because he directly participated, but the court did not say this was the only way a corporate officer could be held personally liable.  In fact, in dicta, the *Moss* court said that a corporate officer is personally liable if she participates in or *authorizes* the discrimination.  *Id.*

Therefore, defendants' contention that corporate officers are personally liable only if they directly participate in discriminatory conduct is unsubstantiated by the cases they cite.

aware of claims of discrimination before that date and, thus, could neither have prevented nor authorized it.

### 3.   **Claims Against Jim Latham.**

Defendant Latham is a broker-manager under an employment contract with FREC. Although not a corporate officer, Latham did oversee the Hoover Office. Just like Ulbricht, Latham is personally liable for his own illegal conduct, and, as manager, he is personally liable for any discriminatory conduct that he "encouraged" or "could have prevented."[58] *Northside*, 605 F.2d at 1354.

Humes' claims against Latham are tenuous at best. Humes never worked at the Hoover Office, and her only contact with Latham was an interview in connection with her application to transfer to the Hoover office. Humes presents no evidence that she was denied transfer to Hoover for discriminatory reasons, or that Latham was aware of any alleged illegal conduct toward her by others. Therefore, as a matter of law, no reasonable jury could find that Latham participated in, encouraged or could have prevented any discriminatory conduct toward Humes.

---

[58] In *Cross v. State of Alabama*, the Eleventh Circuit stated supervisor liability under § 1983 is as follows:

> Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. 49 F.3d 1490, 1508 (citing *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990), *cert. denied*, 500 U.S. 933 (1991)).

> In *Cross*, the director of a state mental health facility discriminated against female employees and created a hostile work environment. *Id.* According to the court, his conduct was so "obvious, flagrant, rampant, and of continued duration" that the record supported the lower court's finding that his supervisors were on notice of the need to correct his discrimination of female employees, and yet failed to do so. *Id.* Therefore, according to the court, the supervisors were liable under § 1983. *Id.*

Byrd, on the other hand, alleges that she told Latham about alleged discriminatory conduct toward her at the Western Office in November 1993. However, Byrd does not allege any facts to support a finding that Latham participated in, encouraged or could have prevented any alleged discriminatory conduct toward her at the Western Office. Immediately after Byrd complained to Latham, she transferred to Hoover and worked under Latham's supervision. While at Hoover, Byrd alleges racially motivated conduct including allegations that Latham told racial jokes while Byrd was at the Hoover Office, that Latham participated in removal of her signs from property adjacent to a Compass Bank location, that Latham sided with Shelton in a conflict over a roof repair, and that Latham told her she was causing havoc in Hoover and suggested that she leave FREC. Therefore, as a matter of law, Latham is not personally liable for any alleged discriminatory conduct toward Byrd prior to her transfer to the Hoover Office. However, a reasonable jury could find that Latham participated in illegal conduct toward Byrd after December 1993, when she transferred to the office over which he had supervisory authority.

Accordingly, as matter of law, Humes' claims against the individual defendant Latham are due to be dismissed on his motion for summary judgment. Additionally, as a matter of law, Latham is not personally liable to Byrd for any alleged discriminatory conduct toward Byrd occurring prior to her transfer to his office in Hoover.

### 4.    **Claims Against Linda Shelton.**

Defendant Shelton, like Latham, is a broker-manager under an employment contract with FREC. Like Latham, Shelton is not a corporate officer, but she did oversee the Western Office. Just like other individual defendants, Shelton is personally liable for her

own illegal conduct, as well as, any discriminatory conduct that she "encouraged" or "could have prevented."[59] *Northside*, 605 F.2d at 1354.

Considering all the undisputed evidence, and construing the disputed facts in a light most favorable to the plaintiffs, a reasonable jury could find that Shelton participated in, encouraged and/or could have prevented illegal conduct toward both Humes and Byrd. Therefore, Shelton's liability to Byrd and Humes is a question that is proper for a jury to decide, and summary judgment on the claims by both plaintiffs against Shelton is not appropriate.

## V.    Conclusion.

Accordingly, defendants' motion for summary judgment will be granted in part and denied in part.  Defendants are entitled to judgment as a matter of law on both plaintiffs' claims of outrage, and defendants' motion for summary judgment on the claims of outrage will be granted.

The defendants are entitled to judgment as a matter of law on all Humes' claims against individual defendants Latham and Ulbricht, and defendants' motion for summary judgment on those claims will be granted.

Finally, as a matter of law, Latham is not personally liable to Byrd for any alleged discriminatory conduct toward Byrd occurring prior to her transfer to his Hoover Office, and Ulbricht is not personally liable to Byrd for any alleged discriminatory conduct toward Byrd before May 1993.

---

[59] *See supra* note 58.

47

The motion otherwise will be denied.

Done, this __30th__ of September, 1997.

Edwin L. Nelson
United States District Judge